## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

IN THE MATTER OF                                        MISCELLANEOUS

LEONARD LEVENSON                                        NO. 11-966

### FINDINGS [1]

Pursuant to Rule 7 of the Court's Rules for Lawyer Disciplinary Enforcement, the Court en banc issues its findings in this disciplinary action against Leonard Levenson on the basis of the record, an evidentiary hearing on September 6, 2013, the memoranda of counsel, and the law. [2]

### A. Procedural Background

The Attorney Disciplinary Committee for the United States District Court for the Eastern District of Louisiana ("Committee") filed charges against respondent based on a complaint brought by Judge Martin L.C. Feldman and Judge Eldon E. Fallon.  The charges filed are based on information discovered during the disciplinary and impeachment proceedings of former Judge G. Thomas Porteous, Jr ("Porteous"). [3] Porteous presided over *Liljeberg Enterprises, Inc. v. Lifemark Hospitals, Inc.*, (the "*Liljeberg* Litigation"), and respondent was

---

[1] Having previously been recused, Judge Fallon, Judge Feldman, and Judge Africk took no part in these proceedings.  Judge Zainey, having previously been remitted by a party to this disciplinary action, abstained.

[2] Exhs. 1, 152.  The evidentiary hearing was before the Honorable Ginger Berrigan.

[3] Only portions of the disciplinary and impeachment records are included in this record.

counsel of record in that litigation.[4]   The Committee has charged him with misconduct in connection with his actions during that litigation.[5]

The Lawyer Disciplinary Committee (the "Committee") assists the court with the administration of lawyer disciplinary enforcement.   Among other duties, the committee reviews disciplinary complaints, makes recommendation to the court regarding the disposition of complaints, and when directed by the court, prosecutes complaints.[6]

The Committee bears the burden of proving the charges of misconduct by clear and convincing evidence, as set forth in Rule 2 of the Rules for Lawyer Disciplinary Enforcement for the Eastern District of Louisiana and the Louisiana Rules of Professional Conduct.

## B. *Liljeberg* Litigation

The long and sordid history of this litigation began in 1981.

Liljeberg Enterprises ("Liljeberg") is a corporation whose sole shareholders are brothers, Robert and John Liljeberg.   The brothers formed a series of corporations and a partnership to own or operate a medical complex.   In 1981, Liljeberg obtained a "certificate of need" to build and operate a 300-bed acute care facility in the New Orleans area.   Litigation, involving multiple issues related to the Liljeberg's entities, began shortly thereafter.   The litigation at issue in this matter spanned the course of ten years.

A detailed background outlining this complex, commercial litigation is reported at, *In re Liljeberg Enterprises, Inc.*, 304 F.3d 410 (5th Cir. 2002), and need not be repeated here.   Suffice it to say, this commercial litigation was

---

[4] *See* Nos. 93–1794, 94–3993,  93–4249,  95–2922 (E.D. La.).

[5] R. Doc. 152.

[6] Rule 4 of the Rules for Lawyer Disciplinary Enforcement for the Eastern District of Louisiana.

contentious, protracted, and expensive. The lines were sharply divided with the Liljeberg interests on one side and Lifemark Hospitals, Inc. ("Lifemark") interests on the other.

Ultimately four lawsuits were consolidated in a Motion to Withdraw the Bankruptcy Reference.[7]  In June 1993, the Motion to Withdraw was filed and transferred to five different judges until it was assigned to Porteous in January 1996.

On September 19, 1996, nine months after the case was assigned to Porteous and approximately six weeks before trial, Liljeberg enrolled Mr. Levenson as co-counsel along with Jacob J. Amato, Jr. ("Amato"), a former law partner of Porteous.[8]  There is no dispute that Messrs. Levenson and Amato were close, personal friends of Porteous and that both were engaged in the litigation on a contingency fee basis.

On October 2, 1996, Lifemark filed a Motion to Recuse under 28 U.S.C. § 455(a) based on the appearance of impropriety created by the close relationship between Porteous and Messrs. Levenson and Amato.  Liljeberg opposed the motion, and Porteous denied it.  Lifemark promptly filed a Writ of Mandamus with the United States Fifth Circuit Court of Appeals, which was denied without assigning reasons in November 1996.[9]  In March 1997, Lifemark enrolled Don C. Gardner, another personal friend of Porteous, as additional counsel of record without objection and without prompting a motion to recuse.[10]

---

[7] No. 93-1794.

[8] No further action was taken on the charges against Amato based on his disbarment in a separate disciplinary action also based on sworn testimony in hearings concerning the impeachment of former Judge Porteous and Amato's voluntary permanent resignation from the practice of law ordered by the Louisiana Supreme Court.  R. Doc. 14.

[9] No. 93-1794, R. Doc. 314.

[10] Gardner was permitted to permanently resign from the practice of law before this Court by majority vote and order dated August 13, 2013.  R. Doc. 157.  Gardner admitted to improper fee-splitting with Tom Wilkinson in conjunction with the *Liljeberg* litigation but denied

After a lengthy trial held intermittently between June 16, 1997, and July 23, 1997, the matter was taken under submission.  On April 26, 2000, Porteous issued a 105-page opinion overwhelmingly in favor of the Liljeberg interests.[11] He overturned a judicial sale, reinstated contracts, and otherwise denied relief to Lifemark.[12]  On appeal, the Fifth Circuit reversed and ruled overwhelmingly in favor of Lifemark, noting previous appellate criticisms of the Liljebergs from earlier opinions and adding its own criticisms as well.[13]  "We conclude that the foundational principles of the entire set of the district court's rulings are deeply flawed.  Such duties are not to be found in Louisiana law."[14]  "The extraordinary duty the district court imposed upon Lifemark, who loaned money to build the hospital and held the mortgage on it to secure its payment, is inexplicable."[15] "This is mere chimera, existing nowhere in Louisiana.  It was apparently constructed out of whole cloth."[16]   The Fifth Circuit found that Porteous's findings "of a 'conspiracy' to wrest control of the hospital and medical office building from [the Liljeberg interests] border on the absurd."[17]  "The district court and Liljeberg Enterprises offer no statutory or case law support for this proposition, for the simple reason that this is not the law."[18]  "On the basis of its clearly erroneous 'conspiracy theory' findings, the district court erred as a matter of law in disregarding long-standing Louisiana jurisprudence that a judicial sale,

---

wrongdoing in all other respects.

[11] *In re Liljeberg Enters. Inc. et al.*, No. 93-1794 (E.D. La. April 26, 2000).

[12] *Id.*

[13] *In re Liljeberg Enters., Inc.*, 304 F.3d 410 (5th Cir. 2002).

[14] *Id.* at 424.

[15] *Id.* at 428.

[16] *Id.* at 429.

[17] *Id.*

[18] *Id.*

once completed, cannot generally be undone."[19]  The litigation was settled and dismissed immediately after remand from the Fifth Circuit.

On September 8, 2008, the Judicial Council of the Fifth Circuit issued an Order and Public Reprimand against Porteous for conduct that included violations of "several criminal statutes and ethical canons" while presiding over the *Liljeberg* litigation, including his denial of Lifemark's motion to recuse.[20] On March 17, 2010, House Resolution 1031 in the United States Senate exhibited Articles of Impeachment against Porteous, one of which involved his making "intentionally misleading statements at the recusal hearing [in the *Liljeberg* litigation] intended to minimize the extent of his personal relationship with the two attorneys."[21]  A hearing was held in the Senate in September 2010.  The Senate found Porteous guilty, impeached, and removed him from office on December 8, 2010.  It ordered him "forever disqualified to hold and enjoy any office or honor, trust or profit under the United States."[22]

## C. Leonard Levenson

According to the amended charges, conduct on the part of Mr. Levenson during the *Liljeberg* litigation violated the Disciplinary Rules of the Eastern District of Louisiana and the Louisiana Rules for Professional Conduct as defined by Rule 8.4 (d) and (f).

> It is professional misconduct for a lawyer to: . . .
> (d) Engage in conduct that is prejudicial to the administration of justice;
> (f) Knowingly assist a judge or judicial officer in conduct that is a violation of applicable Rules of Judicial Conduct or other law[.]

---

[19] *Id.* at 434.
[20] Exh. 34.
[21] Exh. 32.
[22] Exh. 37.

The charges against Mr. Levenson arise out of (1) his alleged failure to more fully apprise the court and opposing counsel of the extent of his relationship with Porteous during the hearing on the motion to recuse in the *Liljeberg* litigation; (2) his continuing to maintain social contacts with Porteous, including free meals and shared hotel rooms, while the *Liljeberg* case was under submission; and (3) by virtue of the conduct outlined in (1) and (2) his knowingly assisting a judge in conduct violating the requirement that a judge respect the law and act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.[23]

The Committee recommends a sanction with a maximum range of three months suspension with a complete or partial deferral and a lower range of public reprimand in memorandum.[24]

At the disciplinary hearing, the parties entered into a stipulation that confirmed virtually every fact set forth in the amended charges against Mr. Levenson.[25]   Mr. Levenson was the only witness called to testify.   The Committee's focus at the hearing was: (1) Mr. Levenson's failure to fully disclose the extent of his contacts with Porteous with regard to the motion to recuse; and (2) Mr. Levenson's contacts with Porteous during the 33 months after trial when the matter was under submission.

### I. Motion to Recuse

Mr. Levenson testified that he was asked to join the *Liljeberg* litigation by Ken Fonte ("Fonte"), counsel for the Liljeberg interests.   The motion to recuse followed shortly thereafter. Levenson testified that he signed the opposition on behalf of Liljeberg but did not draft it.   He further related that he signed the

---

[23] R. Doc. 152 at 9–13.
[24] R. Doc. 179 at 24.
[25] R. Doc. 199.

6

opposition because Fonte "was not exactly being held in high esteem in this building or the building next door."[26]

At the hearing on the motion, Mr. Levenson testified that he did not deny his close relationship with Judge Porteous, nor did opposing counsel indicate any need for further inquiry. Mr. Levenson recalled opposing counsel's statement at the recusal hearing that further inquiry "wasn't necessary, everyone knew."[27] At the hearing, Porteous described his relationship with Levenson as follows:

> Yes, Mr. Amato and Levenson are friends of mine. Have I ever been to either one of them's house? The answer is a definitive no. Have I gone to lunch with them? The answer is a definitive yes. Have I been going to lunch with all the members of the bar? The answer is yes.[28]

Interestingly, the Court notes that Levenson not only failed to expound on Porteous's description of their relationship but bolstered his mischaracterization at oral argument. Levenson related:

> Mr. Mole has alluded in his pleadings, that Mr. Amato and myself are your closest friends. I find it interesting that Mr. Amato and myself are your closest friends that we were not contacted in connection with your appointment. Maybe other people don't think our friendship is viewed the same as Mr. Mole.[29]

In response to the Committee's questions at the disciplinary hearing, Mr. Levenson testified that he "would be surprised" if he had not visited the home of Porteous before the *Liljeberg* litigation.[30] Mr. Levenson confirmed that the House investigators on Porteous's impeachment calculated that Levenson paid for lunches with Porteous as many as 18 to 24 times a year.[31] Levenson further

---

[26] R. Doc. 212 at 40.
[27] *Id.* at 40–41.
[28] Exh. 10.
[29] Exh. 10.
[30] R. Doc. 212 at 13.
[31] *Id.* at 19.

testified that he had on occasion traveled with Porteous, including to the Fifth Circuit Judicial Conference. He related that he and Porteous sometimes shared hotel rooms when their wives were not traveling with them.[32] Additionally, he testified that he bought meals for Porteous and his late wife at the Fifth Circuit Judicial Conference.[33] According to Mr. Levenson, he did not provide details about visiting the former judge's home, sharing many lunches, his paying for those lunches, or paying at the Fifth Circuit Judicial Conference "[b]ecause during the hearing, Mr. Mole (opposing counsel) made it very clear that it was his opinion that our relationship was well known throughout the legal community and further exploration was not necessary."[34]

In response to questions from his own counsel, Mr. Levenson described the atmosphere at the Jefferson Parish courthouse in 1987 when he first became friends with Porteous. He confirmed the many contacts they shared, as set forth in the amended charges and stipulation. He additionally admitted to donating between $50 to $200 to support an externship for Porteous's son in Washington, D.C.[35] Mr. Levenson explained that the donation came as a result of Porteous's secretary's solicitation and indicated that he "had completely forgotten about that until I was visited by the FBI."[36]

Mr. Levenson testified that he could not recall any specific date for the two or three visits that he made to the home of Porteous, other than to testify that other people were in attendance on those occasions.[37] He claimed to have no knowledge of any corrupt relationship between former Judge Porteous and

---

[32] *Id.* at 20.
[33] *Id.*
[34] *Id.* at 20–21.
[35] *Id.* at 34–37.
[36] *Id.* at 46.
[37] *Id.* at 42–43.

former co-counsel Amato.[38]

## II. Contacts While Litigation Was Under Submission

Mr. Levenson testified that he did not engage in lunches or other social contacts with Porteous during the *Liljeberg* trial because he thought it was a "bad idea" and "would give a bad appearance."[39] Levenson and Porteous resumed lunches and social contacts after trial, however, including Levenson's attendance as an invitee of Porteous at the Fifth Circuit Judicial Conference in 1999 when the *Liljeberg* litigation was under submission, and again in May 2000 just after the opinion issued.[40] The latter trip necessarily was planned before the opinion was issued, while the matter was under submission.

In response to questions from the Committee, Mr. Levenson testified that in 1999, while the *Liljeberg* case was under submission, he took two hunting trips with Porteous. On one of the trips, he drove Porteous to the hunting lodge, and stayed in the same room with him for two or three days.[41]

Q.   Now, in addition, as I appreciate it, you had at least two hunting trips that you attended with Judge Porteous; is that correct?

A.   That's correct.

Q.   And these trips that were arranged by another lawyer?

A.   Correct.

Q.   And that Judge Porteous attended, lawyers attended, and basically the agreement was that the lawyers would split the costs, pay for their own expenses and cover Judge Porteous' costs; correct?

A.   Only on one trip.

Q.   And which trip was that?

A.   The second trip.

Q.   And that second trip was in 1999; correct?

---

[38] *Id.* at 46.

[39] *Id.* at 22–23.

[40] *Id.* at 24–27.

[41] In his May 2011 affidavit attached to his response to the disciplinary complaint, Mr. Levenson recalls two hunting trips with former Judge Porteous and avers that "To my recollection, I did not pay for either of these hunting trips, and have been unable to find any documentation that suggests I did." R. Doc. 8-1 at 1.

A.   According to the information that the House investigators produced, it appeared to have been in 1999.

Q.   You don't disagree with that date?

A.   I don't disagree with it.

Q.   I mean, you are satisfied that it was in 1999?

A.   I'm satisfied that it was 1999.

Q,   And on that particular trip, you drove Judge Porteous to the event; correct?

A.   I did.

Q.   To the hunting lodge - -

A.   Correct.

Q.   - where the trip was supposed to be conducted?  And you stayed with Judge Porteous in the same room during the course of the trip; correct?

A.   I believe that's correct.  Yes.

Q.   And there were no other lawyers in attendance because no one else showed up -

A.   That's correct.

Q.   - at the - for the hunting trip?

A.   That's correct.

Q.   So far at least a couple of days, it was you one-on-one basically with Judge Porteous?

A.   I think, yes, two days maybe.  Three at the most.[42]

In 1999, while *Liljeberg* was under submission, Mr. Levenson and his wife met Porteous and his wife in Las Vegas.  While there, they hosted Porteous and his wife for dinner.  Additionally, the couples attended the National Bull Rider's Championship together.[43]  Receipts for meals and expenses relative to those trips were introduced into evidence.[44]

Mr. Levenson baldly denied any discussion with Porteous about the *Liljeberg* matter while it was under submission.  He denied that they even discussed whether it was a "good idea" to be socializing in such a manner during the litigation.[45]  Mr. Levenson testified that he "did not think about" whether an

---

[42] R. Doc. 212 at 29–30.
[43] *Id.* at 30.
[44] Exhs. 17–20, 25.
[45] R. Doc. 212 at 31–32, 49.

objective observer might have concerns that the contacts would raise a question as to Porteous's ability to fairly review the case.[46]

He ignored the gravamen of the inquiry as to why the perceived impropriety of *ex parte* communication during trial would not apply to the critical period of submission.  His cavalier response to this line of questioning was  "my recollection is there was no conscious decision made to start having lunches again.  It's just something that just started again."[47] In answer to his own counsel's question, Mr. Levenson testified that he did not think the contacts before or after the trial violated any ethical rules as to either Porteous  or himself.[48]

## D. Findings

In order to prevail on the charges, the Disciplinary Committee must show by clear and convincing evidence that Mr. Levenson engaged in misconduct "prejudicial to the administration of justice" for purposes of Rule 8.4(d) and "knowingly assist[ed] a judge or judicial officer in conduct that is a violation of applicable Rules of Judicial Conduct or other law" in violation of rule 8.4(f), Canon 2 and 28 U.S.C. §455.[49]   The Court finds that the Committee has established by clear and convincing evidence that Mr. Levenson engaged in misconduct proscribed by both sections of this rule.  The facts contained in the stipulation, frankly, are sufficient to meet the requisite burden of proof.  At the hearing, however, certain facts, which border on the outrageous, carried the case.  The closer the record is examined, the worse Mr. Levenson looks.

---

[46] *Id.* at 32.

[47] *Id.* at 33.

[48] *Id.* at 50.

[49] Canon 2, of the Federal Code of Judicial Conduct provides "A judge Should Avoid Impropriety and the Appearance of Impropriety in All Activities" and that "A judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

Mr. Levenson's reasons for not disclosing or correcting material facts in conjunction with the Motion to Recuse are simply not credible.  He was unapologetic, nonchalant, and almost impertinent throughout his testimony. With regard to the significant nondisclosure of the nature of his contacts with Porteous during the Motion to Recuse hearing, the Court finds his explanation that any shortfall should be visited on opposing counsel to be patronizing.  His less than candid argument regarding his friendship was appalling.  His response to friendly questions regarding the questionable timing of his and Amato's enrollment into the *Liljeberg* litigation were not especially honest.  Levenson and Amato were hired under contingency contracts just weeks before a highly complex, commercial trial.  Oddly enough, no other *Liljeberg* attorney was hired on a contingency fee basis.  The questionable timing of his entrance could certainly call the impartiality of the presiding judge into question.

Mr. Levenson was initially candid in admitting that he attended the Fifth Circuit Judicial Conference four or five times as a guest of Porteous.  He appeared dismissive, however, of the relevance of his contacts with Porteous during the time while the *Liljeberg* matter was under submission.[50]  His testimony was conveniently vague and deferential to the House and FBI investigation findings.  Yet he was certain about the absolute impossibility of any *ex parte* Communication with the former judge about the case.

The most disturbing testimony pertains to the two to three day hunting trip that Mr. Levenson and Porteous spent alone together just months before the issuance of the *Liljeberg* opinion. It appears that this trip was largely ignored during impeachment proceedings and only received the attention it deserved

---

[50]  R. Doc. 212 at 11, 45.

beginning with this disciplinary hearing.[51]  Mr. Levenson's acceptance of its propriety, inability to recall the attorney who paid for it, and terse denial of <u>any</u> *ex parte* communication on that trip is totally unbelievable.  That trip alone presents a clear example of assisting a judge in violating the canons of ethics as charged by the Committee.  Clear and convincing evidence does not necessarily mean direct evidence, which will rarely exist in cases such as this.[52]

Mr. Levenson's argument that his contacts with Porteous, while the matter was under submission, were somehow implicitly sanctioned by the 5th Circuit in the mandamus denial is absurd and offensive.  This Court has previously addressed Porteous's minimization of their relationship at the recusal hearing and Levenson's bolstering of that misrepresentation.  The information presented to the 5th Circuit was less than complete.

In making these findings, the Court necessarily rejects subsidiary arguments made by Mr. Levenson that the Committee's charges are theoretically impossible.  Levenson argues that Rule 8.4(d) and 8.4(f) were too ill-defined to be enforced in the 1990s and remain ill-defined today.  The Court rejects the suggestion "that the ethical standards that should be applied in circumstances such as these can be no greater in scope than the standards for recusal."[53]  He also unconvincingly argues that the charges focus on friendship alone.  "Rather, as Mr. Levenson understands it, the charge is that he was ethically precluded

---

[51] For instance, in his May 2011 response to the Committee, Mr. Levenson criticizes as "inartful phrasing" the Impeachment Report's statement that "Judge Porteous continued to socialize with and accept things of value from Amato, Creely, Gardner and Levenson" because, in part, "[r]ather, [the report] mentions only that the Judge continued to occasionally *socialize* with Mr. Levenson (during which times Mr. Levenson would sometimes purchase food or drinks) and went on a hunting trip with him."  R. Doc. 8 at 7, n.11.  Although only portions of the impeachment proceedings are contained in this record, the evidence presented regarding post-trial contacts is substantially more than this statement would suggest.
[52] *See, e.g.*, *Chapman Law Firm, LPA v. United States*, 113 Fed.Cl. 555, 598 (Fed. Cl. Ct. 2013).
[53] R. Doc. 170 at 9.

from maintaining a friendship with Judge Porteous during the two-year-and-nine-month period that the case remained under advisement."[54]   That is an oversimplified statement of what the record evidence proves.  The record before this Court shows that Levenson willfully participated in Porteous's violation of Canon 2A and 28 U.S.C. § 455(a)  and accordingly violated 8.4(f) of the Rules of Professional Conduct.  While the fact that the impeachment proceedings did not impugn Mr. Levenson weighs in his favor, these post-impeachment disciplinary charges are not limited as a result.[55]

According to the *ABA Standards* §1.1, the purpose of a lawyer disciplinary proceeding such as this "is to protect the public and the administration of justice from lawyers who have not discharged, will not discharge, or are unlikely to discharge their professional duties to clients, the public, the legal system, and the legal profession."  The Commentary states that "it is not the purpose to impose such sanctions for punishment."  After finding misconduct, there are four factors a court should consider in determining an appropriate sanction under §3.0 of the *ABA Standards*: (1) the duty violated; (2) the lawyer's mental state; (3) the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of aggravating[56] or mitigating[57] factors.

---

[54] *Id.* at 26, n.52.

[55] Similarly, the August 2013 decision of the Louisiana Attorney Disciplinary Board Office of the Disciplinary Counsel dismissing its complaint against Mr. Levenson is not controlling where the underlying conduct occurred with regard to a trial in this Court.

[56] Those aggravating factors are identified in §9.2 of the *ABA Standards* as including: (a) prior disciplinary offenses; (b) dishonest or selfish motive; (c)  a pattern of misconduct; (d) multiple offenses; (e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency; (f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process; (g) refusal to acknowledge wrongful nature of conduct; (h) vulnerability of victim; (i) substantial experience in the practice of law; (j) indifference to making restitution.

[57] Those mitigating factors are identified in §9.3 of the *ABA Standards* as including: (a) absence of a disciplinary record; (b) absence of a dishonest or selfish motive; (c) personal or emotional problems; (d) timely good faith effort to make restitution or to rectify consequences of misconduct;

In withholding information with regard to the motion to recuse, in taking extended trips and vacations with Porteous during the post-trial submission period of the *Liljeberg* litigation, and most egregiously, in engaging in an extended hunting trip alone with Porteous prior to the issuance of the opinion, Mr. Levenson violated duties to this Court, the profession, and society as a whole under Rules 8.4(d) and (f). In the opinion of this Court, he did so knowingly and intentionally. He caused, or rather helped cause, enormous damage. His conduct did more than prejudice a single party; it disgraced this entire Court and brought the judiciary into disrepute. The trial court opinion in *Liljeberg* was more than mere impeachment fodder, it was an outrageously unfair opinion issued amidst rampant impropriety.

It is the finding of the court en banc that Leonard Levenson violated the Disciplinary Rules of the Eastern District of Louisiana and Rule 8.4(d), and (f) of the Louisiana Rules for Professional Conduct. The Court adopts the recommendation of the Attorney Disciplinary Committee and imposes discipline of Leonard Levenson. A separate order imposing discipline will be entered. The Court orders these Findings be filed in the record unsealed.

New Orleans, Louisiana, this 24th day of April, 2015.

_____
**SARAH S. VANCE, CHIEF JUDGE**
**for the Court**

---

(e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (f) inexperience in the practice of law; (g) character or reputation; (h) physical disability; (i) mental disability or chemical dependency; (j) delay in disciplinary proceedings; (k) other penalties or sanctions; (l) remorse and (m) remoteness of prior offenses.