## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

IN THE MATTER OF                           MISCELLANEOUS

JOSEPH N. MOLE                             NO. 11-966

### FINDINGS[1]

The Attorney Disciplinary Committee for the United States District Court for the Eastern District of Louisiana ("Committee") has filed charges and amended charges (the "amended charges")[2] against respondent, Joseph N. Mole, based on a complaint brought by Judge Martin L.C. Feldman and Judge Eldon E. Fallon. The amended charges are based on information discovered during the disciplinary and impeachment proceedings of former Judge G. Thomas Porteous, Jr. ("Porteous").[3]  Pursuant to Rule 7 of the Court's Rules for Lawyer Disciplinary Enforcement, the Court en banc issues its findings against Mr. Mole in this disciplinary action on the basis of the record, an evidentiary hearing held on September 6, 2013, the memoranda of counsel, and the applicable law.[4]

**Background**

Brothers John and Robert Liljeberg are the sole shareholders of Liljeberg Enterprises, Inc. ("Liljeberg Enterprises"). Around 1980, they formed a series of corporations and a partnership to own or operate a medical complex in Kenner. St. Jude Medical Office Building, Ltd. Partnership, a wholly-owned subsidiary of Liljeberg

---

[1] Having previously been recused, Judge Fallon and Judge Feldman took no part in these proceedings. Judge Zainey, having previously been remitted by a party to this disciplinary action, abstained. Judge Berrigan dissents from these Findings.

[2] *See* Docs. 1, 152. (Documents referenced are filed in this proceeding unless otherwise noted. Exhibits referenced were filed into evidence at the September 6, 2013 evidentiary hearing unless otherwise noted.)

[3] It should be noted that relevant portions of the Porteous impeachment records, including the transcript of the hearing in the Senate, are included in this record.

[4] Although Judge Berrigan held the evidentiary hearing in this matter, these Findings are based on an independent review of the entire record, including the transcript of the evidentiary hearing, the transcript of the testimony before the Senate, the memoranda of counsel, and the applicable law.

Enterprises ("St. Jude"), owned the medical building adjacent to the hospital site subject to a mortgage to Travelers Insurance. In 1981 the Liljebergs obtained a "certificate of need" to build and operate a 300-bed acute care facility in the New Orleans area. The hospital was constructed by St. Jude, with financing provided by Lifemark Hospitals, Inc. ("Lifemark"), and leased to Lifemark. Liljeberg Enterprises provided pharmaceutical services to the hospital. By March of 1990, St. Jude had defaulted on the Travelers mortgage on the medical office building. Travelers obtained a judgment against St. Jude which it used to secure a lien on the hospital. Travelers' lien primed Lifemark's collateral mortgage on the hospital because Lifemark had not reinscribed its mortgage. Shortly thereafter, first Liljeberg Enterprises and then St. Jude filed for Chapter 11 bankruptcy protection. In 1994 Travelers began the process of foreclosing on the hospital and eventually acquired ownership. Lifemark's lease on the hospital was extinguished, Lifemark accelerated the debt owed by St. Jude, and Lifemark sought to terminate the pharmacy agreement with the Liljebergs. Ultimately four lawsuits were consolidated and tried to the United States District Court for the Eastern District of Louisiana in 1997 (the "Liljeberg litigation").[5] Porteous presided over the trial and Mr. Mole was counsel of record for Lifemark.[6] The Committee has charged Mr. Mole with misconduct in connection with his actions during that litigation.[7]

Mr. Mole enrolled as counsel in the Liljeberg litigation in April 1996; the non-jury trial was set for November 1996. On September 19, nine months after the case was assigned to Porteous and approximately six weeks before trial, the Liljeberg interests enrolled Leonard Levenson as co-counsel along with Jacob J. Amato, Jr. ("Amato"), an

---

[5] See Liljeberg Enters., Inc. v. Lifemark Hosps., Inc., Nos. 93-cv-1794+ (E.D. La. 1993).
[6] A detailed accounting of the history of this litigation and Porteous's rulings may be found in In re Liljeberg Enters., Inc., 304 F.3d 410 (5th Cir. 2002).
[7] Doc. 152.

ex-law partner of Porteous.[8]  There is no dispute that Messrs. Levenson and Amato were personal friends of Porteous at the time of their enrollment and that both were engaged on a contingency fee basis.  Mr. Mole did not know Porteous when he enrolled on behalf of Lifemark.[9]

On October 2, 1996, Lifemark filed a motion to recuse Porteous under 28 U.S.C. § 455(a) based on the appearance of impropriety created by the close relationship between Messrs. Levenson and Amato.  The motion was opposed by Liljeberg and denied later that month by Porteous.[10]  Lifemark promptly filed a writ of mandamus with the United States Fifth Circuit Court of Appeals, which denied the writ in October 1996 without assigning reasons.  In March 1997, Lifemark enrolled Don C. Gardner ("Gardner") as additional counsel of record without objection and without prompting a motion to recuse.[11]  There is no dispute that Mr. Gardner was a close personal friend of Porteous at the time of the enrollment.

After a lengthy trial held intermittently between June 16 and July 23, 1997,  the matter was taken under submission.  On April 26, 2000, Porteous issued a 105-page opinion overwhelmingly in favor of the Liljeberg interests.[12]  He overturned a judicial sale, reinstated contracts, and otherwise denied relief to Lifemark.[13]  On appeal, the Fifth Circuit reversed and ruled overwhelmingly in favor of Lifemark.  "We conclude

---

[8] No further action was taken on the charges against Mr. Amato based on his disbarment in a separate disciplinary action also based on sworn testimony in hearings concerning the impeachment of Porteous and Mr. Amato's voluntary permanent resignation from the practice of law ordered by the Louisiana Supreme Court. Doc. 14, *In re Amato*, Misc. 10-523 "I".

[9] Doc. 211 at 17.

[10] At that time, the November 1996 trial date was continued to June 1997.

[11] Gardner was permitted to permanently resign from the practice of law before this Court by majority vote and order dated August 13, 2013.  Doc. 157.  Gardner admitted to improper fee-splitting with Tom Wilkinson ("Wilkinson") in conjunction with the *Liljeberg* litigation, but denied wrongdoing in all other respects.

[12] *See Liljeberg Enters., Inc. v. Lifemark Hosps., Inc.*, Nos. 93-cv-1794+, Docs. 471-472 (E.D. La. 1993)

[13] *See id.*

that the foundational principles of the entire set of the district court's rulings are deeply flawed. Such duties are not to be found in Louisiana law."[14]  "The extraordinary duty the district court imposed upon Lifemark, who loaned money to build the hospital and held the mortgage on it to secure its payment, is inexplicable."[15]  "This is mere chimera, existing nowhere in Louisiana. It was apparently constructed out of whole cloth."[16]  The Fifth Circuit found that Porteous's findings "of a 'conspiracy' to wrest control of the hospital and medical office building from [the Liljeberg interests] border on the absurd . . . . The district court and Liljeberg Enterprises offer no statutory or case law support for this proposition, for the simple reason that this is not the law."[17]  "On the basis of its clearly erroneous 'conspiracy theory' findings, the district court erred as a matter of law in disregarding long-standing Louisiana jurisprudence that a judicial sale, once completed, cannot generally be undone."[18]  The litigation was settled and dismissed immediately after remand from the Fifth Circuit.

On September 10, 2008, the Judicial Council of the Fifth Circuit issued an Order and Public Reprimand against Porteous for conduct that included violations of "several criminal statutes and ethical canons" while presiding over the *Liljeberg* litigation, including his denial of Lifemark's motion to recuse.[19]  On March 17, 2010, House Resolution 1031 in the United States Senate exhibited Articles of Impeachment against Porteous, one of which involved his making "intentionally misleading statements at the recusal hearing [in the *Liljeberg* litigation] intended to minimize the extent of his

---

[14] *Liljeberg*, 304 F.3d at 424.
[15] *Id.* at 428.
[16] *Id.* at 429.
[17] *Id.* at 431.
[18] *Id.* at 434.
[19] Exh. 34, pp. 2-9.

personal relationship with the two attorneys."[20]  A hearing was held in the Senate in September 2010.  The Senate found Porteous guilty, impeached and removed him from office on December 8, 2010, and ordered him "forever disqualified to hold and enjoy any office or honor, trust or profit under the United States."[21]

**Committee's Amended Charges**

According to the Committee's amended charges against Mr. Mole, he violated the Disciplinary Rules of the Eastern District of Louisiana and Rule 8.4(d), (e) and (f) of the Louisiana Rules for Professional Conduct,[22] which provide that it is professional misconduct for a lawyer to:

> (d) Engage in conduct that is prejudicial to the administration of justice;
> (e) State or imply an ability to influence improperly a judge, judicial officer, governmental agency or official or to achieve results by means that violate the Rules of Professional Conduct or other law;
> (f) Knowingly assist a judge or judicial officer in conduct that is a violation of applicable Rules of Judicial Conduct or other law[.]

The Committee charges Mr. Mole's recommendation of Mr. Gardner to his client with the intent to secure the recusal of Porteous was prejudicial to the administration of justice, implied an ability to improperly influence a judge and knowingly assisted a judge in conduct violating Canon 2, Paragraph A of the Federal Code of Judicial Conduct, which requires a judge to "respect ... the law [and] conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."[23]  The Committee charges the letter agreement drafted by Mr. Mole for the retention of Mr. Gardner violated all three cited provisions of the Louisiana Rules of

---

[20] Exh. 32.
[21] Exh. 37.
[22] Rules 1.2 and 2.1 of the United States District Court for the Eastern District of Louisiana, Rules for Lawyer Disciplinary Enforcement, adopt the Louisiana Rules of Professional Conduct and incorporate the definition provided therein of misconduct.
[23] Doc. 152 at 7, ¶ 17 (first alteration in original).

Professional Conduct and knowingly assisted a judge in conduct violating Canon 2, Paragraph B of the Federal Code of Judicial Conduct, which requires that "[a] judge should not allow ... social, or other relationships to influence his judicial conduct or judgment ... nor shall he convey or permit others to convey the impression that they are in a special position to influence him."[24]  The Committee recommends a sanction of one year suspension with six months deferred.[25] As the Committee described it, the core issue is "whether an attorney who knowingly searches for an attorney to retain who is a close friend of the presiding judge, submit[s] to his client the name of an attorney who has nothing of substance to offer other than such a friendship, and then negotiate[s] and draft[s] a contract that pays a $100,000 'severance' fee if the judge 'withdraws'" has violated the Disciplinary Rules of the Eastern District of Louisiana and Rule 8.4(d), (e) and (f) of the Louisiana Rules for Professional Conduct.[26]

**Factual Findings**

In disciplinary proceedings, we act as triers of fact to determine whether the alleged misconduct has been proven by clear and convincing evidence. As set forth in Rule 2 of the Rules for Lawyer Disciplinary Enforcement for the Eastern District of Louisiana and Rule XIX, Section 18D of the Louisiana Rules of Professional Conduct, the Committee bears the burden of proof. Clear and convincing does not necessarily mean direct evidence, which will rarely exist in cases such as this.[27]

There is no dispute, and clear and convincing evidence supports a finding that, Mr. Gardner was a close friend of Porteous. Their friendship began in law school at LSU

---

[24] Doc. 152 at 7, ¶ 18 (alterations in original).
[25] Doc. 210 at 10.
[26] Doc. 116 at 8.
[27] *See, e.g., Chapman Law Firm, LPA v. United States*, 113 Fed. Cl. 555, 598 (Fed. Cl. Ct. 2013).

in the early 1970's.[28]  Porteous was in Mr. Gardner's wedding party and is the godfather of Mr. Gardner's daughter; Mr. Gardner's family was part of Porteous's Thanksgiving dinner; Mr. Gardner and Porteous celebrated their birthdays together;[29] and all three of Porteous's children called Mr. Gardner "Uncle Don."[30]  Mr. Gardner attended CLEs with Porteous and, although he does not like gambling, Mr. Gardner would give Porteous money to gamble at casinos on occasion.[31]  Mr. Gardner also gave Porteous money to help defray the expenses his son incurred as an extern at the United States Senate.[32]

There also is no dispute, and clear and convincing evidence supports a finding that, Mr. Gardner was hired solely because of his friendship with Porteous.[33]  Mr. Gardner had a generalized state court practice dealing with adoptions, divorces, custody, wills, successions, and personal injury and did not practice in federal court.[34]  Clearly, Mr. Mole selected Mr. Gardner, notwithstanding Mr. Gardner's lack of expertise with this type of complex case and little or no experience in federal court,[35] because of his close relationship with the judge. Mr. Gardner correctly perceived his role in the litigation and testified at the Senate hearing that the defense wanted a pretty face, someone who knew the judge.[36]  As Mr. Mole relayed it, Mr. Gardner stressed that he could "sit at counsel table, smile and look pretty, but there's not much else I can do."[37]

These facts, together with the terms of the letter agreement between Lifemark and Mr. Gardner establish by clear and convincing evidence that Mr. Mole's intent was

---

[28] *See* Doc. 211 at 123.
[29] Exh. 2, Gardner Senate Testimony, p. 1408.
[30] Doc. 211 at 145-146.
[31] *Id.* at 146; Exh. 2, Gardner Senate Testimony, pp. 1441-1442.
[32] Exh. 2, Gardner Senate Testimony, pp. 1442-1443.
[33] Exh. 2, Mole Senate Testimony, p. 393-394; Doc. 211 at 50-51.
[34] Exh. 2, Gardner Senate Testimony, pp. 1407, 1409, 1410.
[35] Exh. 2, Mole Senate Testimony, p. 421.
[36] Exh. 2, Gardner Senate Testimony, p. 1411.
[37] Exh. 2, Mole Senate Testimony, p. 397.

to prompt Porteous's recusal. Mr. Mole admits he drafted the letter agreement between Lifemark and Mr. Gardner. [38]  The letter agreement advised Mr. Gardner that Lifemark was willing to offer him a fee for assisting in the Liljeberg case, and that the fee would consist of an upfront payment (a flat fee) and a contingency fee in the event there was a judgment allowing Lifemark to terminate the pharmacy agreement with no liability for future damages. The letter agreement offered Mr. Gardner certain additional fees in the event a judgment is rendered at certain designated levels, commonly referred to as a "reverse contingency" agreement. Most significantly for our purposes, Lifemark also agreed to pay Mr. Gardner a "severance fee" in the event Porteous withdrew or the case settled prior to trial:

> Further, Lifemark will pay you $100,000 as a severance fee in the event that Judge Porteous withdraws or if the case settles prior to trial. This would result in a total of $200,000 ($100,000 retainer plus $100,000) if the case settles or if Judge Porteous ceases to be our judge. This is to satisfy your concern that involvement in this time consuming case will harm your present practice.

Mr. Mole testified at the hearing before this Court that no one "realistically thought [the litigation was] going to settle."[39] The much more likely scenario under which Mr. Gardner would receive the severance fee was for Porteous to withdraw from the litigation. Mr. Mole admitted that recusal would have been the most obvious reason for the judge to withdraw.[40]

When asked at the Senate hearing about payments to Mr. Gardner, Mr. Mole testified that "the one that stands out into my mind is that if his entry into the case caused Judge Porteous to recuse him, there would be another payment, because it was

---

[38] Exh. 16. Although the copy of the letter in evidence is unsigned, Mr. Mole testified that the agreement was executed (Mole Senate Testimony, p. 429; Doc. 211 at 65) and this is not in dispute.  Doc. 211 at 54.
[39] Id. at 70.
[40] Id. at 67.

my – I felt like getting the judge to recuse himself would be the only way to get a fair outcome" at trial.[41] Mr. Mole testified he thought that, if Porteous saw that his relationship with Mssrs. Levenson and Amato was so close people were willing to engage them because of it, he would recuse himself.[42] Mr. Mole further testified he told Gardner "it would be good if [Judge Porteous] could recuse himself" and he thought having good friends on both sides of the case would cause "some internal conflict" that would lead Porteous to recuse himself.[43] Mr. Mole testified that "getting Judge Porteous to recuse himself was a priority with [him], and one of the things [he] hoped Mr. Gardner's presence in the case . . . would accomplish."[44] Mr. Mole "hoped" Mr. Gardner's entry into the case as counsel for Lifemark "might" lead Porteous to rethink the situation and recuse himself.[45] When asked in this Court whether he hoped the retention of Mr. Gardner would lead to Porteous's recusal, Mr. Mole responded "yes, I certainly considered that maybe if Don got involved, I knew Judge Porteous didn't have a legal responsibility to recuse himself because of that but that he might."[46]

According to Mr. Mole's testimony at the hearing in this Court, the letter agreement with Mr. Gardner was "mostly his work," and the structure was entirely a "product of [his] thinking," with perhaps some input from his client.[47] "I think the paragraph speaks for itself, to some extent, although I'll accept the criticism that it's a terribly drafted document."[48] Mr. Mole testified he had never before drafted an agreement containing a severance fee contingency, along with fees based on the

---

[41] Exh. 2, Mole Senate Testimony, p. 395.
[42] *Id.* at 436.
[43] *Id.* at 422.
[44] *Id.*
[45] *Id.*
[46] Doc. 211 at 68.
[47] *Id.* at 54, 62, 65.
[48] *Id.* at 172.

outcome of the litigation.[49]  He candidly stated that its purpose reflected the reality that if Porteous were to quit the case, there was no need for Gardner's services.[50]

Mr. Gardner described the severance fee as being "the one that stands out that I know everybody is going to be interested in, is that they also included $100,000 if Judge Porteous would recuse himself."[51]  By the time he testified before the Senate, Mr. Gardner had a "real strong opinion" that this payment was to get him to "encourage someone to get off the case for an extra $100,000. I think they already thought I was a prostitute because it was a lot of money. They just didn't know how high the number was going to go."[52] "I think it was a big incentive. I think somebody thought I was a trout and I would bite."[53]

Mr. Mole testified the terms of the letter agreement were not drafted in an attempt to secure the recusal of Porteous and that instead the severance fee was to pay Mr. Gardner enough to "buy him out of the case" in the event Porteous was no longer the judge because Mr. Gardner's services would no longer be needed.[54] The Court finds testimony that the terms of the letter agreement were not drafted in an attempt to secure the recusal of Porteous to be incredible.  Instead, the Court finds that Mr. Mole's ultimate goal was to hire a good friend of Porteous to get the judge off the case and the severance fee gave Mr. Gardner an incentive to make that happen.  Mr. Mole attempted to justify the severance fee as necessary to induce Mr. Gardner to take on the representation, but there is no evidence Mr. Gardner demanded a severance fee before agreeing to represent Lifemark.  Instead, Mr. Gardner testified he had no discussions

[49] Exh. 16, Rec. Doc. 211 at 73.
[50] Doc 211 at 60.
[51] Exh. 2, Gardner Senate Testimony, p. 1415.
[52] *Id.* at p. 1416; Doc. 211 at 161.
[53] Exh. 2, Gardner Senate Testimony, page 1418.
[54] *Id.* at 68-69, 172-173.

10

with Mr. Mole about the financial terms of the agreement, that the agreement was unilaterally written by Mr. Mole and sent to him, and that he did not engage in any negotiation about the terms.[55]  Because Mr. Gardner had no discussions with Mr. Mole about the fee arrangement, Mr. Gardner could not have expressed any concerns about damage to his then current practice or demanded a severance fee.

Mr. Gardner also testified he told Mr. Mole, "I'm not going to be able to change any outcome, I'm not going to be able to influence the judge.  But I can help you understand the way he thinks. I can tell you what I know about him as a person that might help you in the way you present your evidence in the case."[56] Even if accepted as true, this testimony does not refute the evidence that Mr. Mole selected Mr. Gardner primarily to get Porteous recused. Instead, Mr. Gardner's testimony only explains his role in the litigation in the event the Porteous recusal did not occur despite all Mr. Mole's efforts.

We find the clear and convincing evidence introduced at the Senate hearing and before this Court establishes Mr. Mole selected and recommended Mr. Gardner to represent Lifemark because of Mr. Gardner's close friendship with Porteous and with the intent to get Porteous recused. We also find the clear and convincing evidence establishes the severance fee in the letter agreement was intended to provide an incentive for Mr. Gardner to achieve this result.

**Grounds for Discipline**

Based on our factual findings, we conclude Mr. Mole has committed misconduct proscribed by the Disciplinary Rules of the Eastern District of Louisiana and Rule 8.4(d)

---

[55] *Id.* at 132, 151.
[56] Exh. 2, Mole Senate Testimony, p. 397.

and (e) of the Louisiana Rules for Professional Conduct as prejudicial to the administration of justice and implying an ability to improperly influence a judge. Although the hiring of Mr. Gardner solely because of his close friendship with Porteous is troubling, the Court finds this fact alone would not support a finding by clear and convincing evidence that Mr. Mole violated the Louisiana Rules for Professional Conduct. There is no bright line rule forbidding a friend, even a good friend, from appearing before a judge, just as there is no rule that a judge must recuse himself upon enrollment of a friend as counsel.[57] Indeed, in this case, the Fifth Circuit denied the writ of mandamus filed by Mr. Mole seeking to have Porteous recused from the case because of his friendship with Mssrs. Amato and Levenson.[58] In a related case, the Fifth Circuit found that the failure of another district judge to recuse himself was not an abuse of discretion reminding readers that:

> [i]n today's legal culture friendships among judges and lawyers are common. They are more than common; they are desirable. A judge need not cut himself off from the rest of the legal community. Social as well as official communications among judges and lawyers may improve the quality of legal decisions. Social interactions also make service on the bench, quite isolated as a rule, more tolerable to judges. Many well-qualified people would hesitate to become judges if they knew that wearing the robe meant either discharging one's friends or risking disqualification in substantial numbers of cases. Many courts therefore have held that a judge need not disqualify himself just because a friend—even a close friend—appears as a lawyer.[59]

But this is not merely a case in which a friend of the judge enrolls as counsel. Instead, this is a case in which Mr. Gardner was hired solely because of his friendship with Porteous and with the intent to secure the recusal of Porteous. The large severance fee

---

[57] 28 U.S.C. § 455 is the primary source of disqualification in the federal judicial system; personal friendship alone is not listed as a basis for disqualification. Instead, a judge must disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

[58] *See* Rec. Doc. 314, No. 93-cv-1794.

[59] *Travelers Ins. Co. v. Liljeberg Enters., Inc.*, 38 F.3d 1404, 1411 n.3 (5th Cir. 1994) (alteration in original) (quoting *United States v. Murphy*, 768 F.2d 1518, 1537 (7th Cir. 1985)).

promised to Mr. Gardner to secure this unethical result is further evidence of Mr. Mole's intent.

Judge Alvin Rubin addressed legal counsel's professional responsibility in a case in which the judge's brother-in-law enrolled as local counsel as a stratagem to disqualify the judge under 28 U.S.C. § 455. Although the case involved the judge's duty to disqualify himself, Judge Rubin explained the brother-in-law's ethical obligation not to enroll for the purpose of disqualifying the judge:

> The drafters of § 455 warned that "each judge must be alert to avoid the possibility that those who would [seek his disqualification] are in fact seeking to avoid the consequences of his expected adverse decision." In light of Congress' intent and the needs of judicial efficiency, we hold that counsel may not be chosen solely or primarily for the purpose of disqualifying the judge. The district court threatened with such maneuvers need not confine itself to grievance proceedings against errant counsel. "A motion to disqualify counsel is a proper method for a party-litigant to bring the issues of conflict of interest or a breach of ethical duties to the attention of the court.
>
> * * * *
>
> The needs of judicial administration are not our sole consideration. Lawyers are members of a learned profession asserting high ethical standards. The lawyer's exclusive right to practice is afforded because of the ethical standards of the profession as well as its members' technical knowledge and specialized skill. An ethical code is not a garment that lawyers may don and doff at pleasure. A lawyer must qualify to practice by satisfying an examining committee of his good moral character and by passing an examination that includes testing for knowledge of ethical precepts as well as substantive rules. Lawyers are not permitted to do everything for a client that he would stoop to do himself had he but their knowledge. A lawyer must not make "any statement or suggestion ... that he can or would circumvent" procedures by which legal matters can be presented in an impartial manner. A lawyer should not, therefore, lend himself to a contrivance by which his services are sought not for his ability but solely because his relationship with a judge enables the litigant who employs him to exercise a *de facto* peremptory challenge to the judge.[60]

---

[60] *McCuin v. Tex. Power & Light Co.*, 714 F.2d 1255, 1264 (5th Cir. 1983) (alterations in original) (footnotes omitted).

It is true that Mr. Mole himself did not enroll to secure the recusal of Porteous, but he did participate in a contrivance by which Mr. Gardner's services were sought and obtained and Mr. Gardner enrolled for that purpose. The fact that the contrivance involved Mr. Gardner's enrollment as co-counsel to cause recusal, rather than Mr. Mole's enrollment for that purpose, is a distinction without a difference. Mr. Mole committed misconduct under the Louisiana Rules of Professional Misconduct.

**Imposition of Discipline**

Disciplinary proceedings are not meant primarily to punish the lawyer,[61] but rather to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct.[62] According to the *ABA Standards for Imposing Lawyer Sanctions* §1.1, the purpose of a lawyer disciplinary proceeding such as this "is to protect the public and the administration of justice from lawyers who have not discharged, will not discharge, or are unlikely to discharge their professional duties to clients, the public, the legal system, and the legal profession."[63] The Court finds Mr. Mole has breached duties he owes to the Court, the legal system and to the legal profession through his knowing and intentional misconduct. Mr. Mole's conduct has harmed the public by eroding the trust and confidence the public must have in the legal system for it to function properly.

The discipline to be imposed by this Court depends upon the facts of the case and the seriousness of the offenses involved considered in light of any aggravating and

---

[61] *In re Estiverne*, 741 So. 2d 649, 654 (La. 1999). We have adopted the Louisiana Rules of Professional Conduct in our Rules for Lawyer Disciplinary Enforcement. We may consult decisions of the Louisiana Supreme Court for guidance in applying those rules.

[62] *In re Downing*, 930 So. 2d 897, 904 (La. 2006) (citing *La. State Bar Assoc. v. Reis*, 513 So. 2d 1173 (La. 1987)).

[63] We also may consult the *ABA Standards for Imposing Lawyer Sanctions* when conducting disciplinary proceedings.

mitigating circumstances.[64] After finding misconduct, the Court may consider the factors set out in § 3.0 of the *ABA Standards for Imposing Lawyer Sanctions* when determining an appropriate sanction: (1) the duty violated; (2) the lawyer's mental state; (3) the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of aggravating[65] and mitigating[66] factors. There are several aggravating factors the Court has considered in fashioning a penalty for Mr. Mole's action. First, Mr. Mole's conduct was intentional and sprang from a dishonest motive. Second, Mr. Mole has extensive experience in the practice of law. Third, Mr. Mole has failed to acknowledge the wrongful nature of his conduct. Mitigating factors to be considered are Mr. Mole's lack of a prior disciplinary record; his good reputation within the legal community; his full disclosure and cooperation with proceedings in this Court, in the Fifth Circuit and before the Senate; and the delay in these disciplinary proceedings.

In light of the misconduct proven in this case and the harm caused to the public and to the legal profession, and after consideration of the aggravating and mitigating factors applicable in this case, the Court has determined that the sanction to be imposed in this case is a one year suspension with six months deferred.

---

[64] *In re Downing*, 930 So. 2d at 904.

[65] Those aggravating factors are identified in § 9.2 of the *ABA Standards* as including: (a) prior disciplinary offenses; (b) dishonest or selfish motive; (c) a pattern of misconduct; (d) multiple offenses; (e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency; (f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process; (g) refusal to acknowledge wrongful nature of conduct; (h) vulnerability of victim; (i) substantial experience in the practice of law; (j) indifference to making restitution; and (k) illegal conduct, including that involving the use of controlled substances.

[66] Those mitigating factors are identified in § 9.3 of the *ABA Standards* as including: (a) absence of a prior disciplinary record; (b) absence of a dishonest or selfish motive; (c) personal or emotional problems; (d) timely good faith effort to make restitution or to rectify consequences of misconduct; (e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (f) inexperience in the practice of law; (g) character or reputation; (h) physical disability; (i) mental disability or chemical dependency including alcoholism or drug abuse; (j) delay in disciplinary proceedings; (k) imposition of other penalties or sanctions; (l) remorse; (m) remoteness of prior offenses.

**Conclusion**

It is the finding of the Court en banc that Joseph N. Mole's misconduct was a violation of the Disciplinary Rules of the Eastern District of Louisiana and Rule 8.4(d) and (e) of the Louisiana Rules for Professional Conduct. The Court adopts the recommendation of the Attorney Disciplinary Committee and imposes discipline on Joseph N. Mole. These findings are to be made public. A separate order imposing discipline will be entered.[67]

New Orleans, Louisiana, this 5th day of June, 2015.

**SARAH S. VANCE,  CHIEF JUDGE**
**FOR THE COURT**

---

[67] Respondent urges that this Court apply Rule 31 of the Louisiana Rules for Lawyer Disciplinary Enforcement and dismiss this action because any misconduct was merely negligence and the misconduct occurred more than ten years before the date of the disciplinary complaint. The Court need not decide whether it would, in an appropriate action, apply this rule as Mr. Mole's conduct was intentional.