BERRIGAN, District Judge, dissenting:

I respectfully dissent for all of the reasons set forth in my July 24, 2014, Findings and Recommendations to the *en banc* Court, and I request that a redacted copy of that document be attached to the Court's Findings.   I presided over an extremely difficult hearing on this matter, as required by the procedure set forth in this Court's Rules for Lawyer Disciplinary Enforcement. While I certainly understand that my Findings and Recommendations are in no way binding on the *en banc* Court, I also know that the revised Findings are based largely on what I consider to be clearly erroneous assessments as to Mr. Mole's credibility and intent. ███████████
███████████████████████████████████████

In addition, the revised Findings, I believe, unfairly and incorrectly minimize the sordid history of the litigation and the undisputed fact that two of our brethren who issued unethical and unfair opinions in favor of the Liljebergs were <u>impeached.</u>  In addition, two major opinions on disqualification emanated from the litigation.  Former Judge Collins was harshly criticized in dissent by Judge Rubin and the Supreme Court in the 1980's and the Fifth Circuit imposed sanctions against the Liljebergs for their recusal campaign attacks on Judge Mentz in the 1990's, while ironically acknowledging that "[m]any court[s] have held that a judge need not disqualify himself just because a friend – even a close friend – appears as a lawyer."  Like it or not, Mr. Mole approached this litigation with these facts.

Mr. Mole was caught in a very difficult situation.  He tried every way out, but was thwarted when former Judge Porteous refused to recuse himself, despite his long standing relationship with Mr. Levenson.  Not only had the Fifth Circuit condoned the hiring of a friend as co-counsel <u>twice</u>, but Mr. Mole felt he had to "level of the playing field" by having Don Gardner, another "friend" of former Judge Porteous, to offset the impact of Mr. Levenson.  I credit Mr. Mole for having the integrity to acknowledge that Mr. Gardner was hired at least in part because he was a "friend" of former Judge Porteous.  As it turned out, because of that friendship, Mr. Gardner was able to give Mr. Mole many helpful suggestions on how to proceed with the defense and gave the client at least the opportunity to be heard.  It was clear to Mr. Mole that former Judge Porteous was already very hostile to his position, but Mr. Gardner's suggestions helped to smooth over some of those rough edges.

Hindsight is 20-20, but Mr. Mole had no idea how the case would turn out.   As it was, the Fifth Circuit reversed, but Mr. Mole could not have anticipated that and the case was worth millions of dollars.  Finally, Mr. Mole could not have expected that former Judge Porteous would be removed from the bench.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN THE MATTER OF                          MISCELLANEOUS

LEONARD LEVENSON                          NO. 11-966
JOSEPH N. MOLE
                                          SECTION "C"

                                          **SEALED**

<u>FINDINGS AND RECOMMENDATIONS</u>

Pursuant to Rule 7 of the Court's Rules for Lawyer Disciplinary Enforcement, the

undersigned reports to the Court en banc its findings and recommendations in this

disciplinary action against Joseph N. Mole and Leonard Levenson on the basis of the

record, an evidentiary hearing on September 4, 2013, pertaining to Mr. Mole, an

evidentiary hearing on September 6, 2013, pertaining to Mr. Levenson, the memoranda

of counsel and the law.

**Procedural Background**

The Attorney Disciplinary Committee for the United States District Court for the

Eastern District of Louisiana ("Committee") has filed charges against respondents based

on a complaint brought by Judge Martin L.C. Feldman and Judge Eldon E. Fallon, which

they based on information discovered during the disciplinary and impeachment

proceedings of former Judge G. Thomas Porteous, Jr.[1]  Exhs. 1, 152.  Former Judge

Porteous presided over *Liljeberg Enterprises, Inc. v.  Lifemark Hospitals, Inc.*, Nos. 93-cv-

1794+ (E.D. La. 1993), and both respondents were counsel of record in that litigation.

The Committee has charged them with misconduct in connection with their actions

during that litigation.[2]  The parties appear to agree that in order for discipline to be

imposed, the Committee bears the burden of proving its charges of misconduct against

each respondent by clear and convincing evidence, as set forth in Rule 2 of the Rules for

Lawyer Disciplinary Enforcement for the Eastern District of Louisiana and the

Louisiana Rules of Professional Conduct.

### *Liljeberg* litigation

John and Robert Liljeberg are brothers who are the sole shareholders of Liljeberg

Enterprises, Inc., through which a series of corporations and a partnership were formed

to own and operate a medical complex in Kenner.  One of the Liljeberg brothers formed

a corporation to obtain a "certificate of need" required to build and operate the facility in

1979.  The certificate was issued in 1981.  *Liljeberg v. Health Services Acquisition Corp.*, 486

U.S. 847 (1988); *Liljeberg v. Lifemark Hospitals, Inc. v. Liljeberg Enterprises, Inc.*, 304 F.3d

---

[1]It should be noted that only portions of the disciplinary and impeachment records are included
in this record.

[2]A copy of the Amended Charging Document is attached as "Exhibit A." Rec. Doc. 152.

410 (5th Cir. 2002).  Litigation began shortly thereafter.

Unbelievably, judicial misconduct became an issue as early as 1993 in this litigation.  Litigation involving the ownership of the certificate of need was tried by former Judge Robert F. Collins without a jury in January 1982.  Former Judge Collins quickly ruled in favor of Liljeberg and was affirmed on appeal by the Fifth Circuit, but Judge Alvin Rubin wrote a scathing dissent and was extremely critical of former Judge Collins's fact-finding and credibility assessments of Liljeberg, whom he accused of "chicanery."  *Health Services Acquisition Corp. v. Liljeberg*, 691 F.2d 500 (5th Cir. 1982) (unpublished).

Ten months later, the losing party discovered that former Judge Collins had been sitting on Loyola's Board of Trustees during the pendency of the case at a time when Liljeberg was negotiating with Loyola to purchase the land on which to construct the hospital.  "The success and benefit to Loyola of these negotiations turned, in large part, on Liljeberg prevailing in the litigation before Judge Collins."  *Liljeberg*, 486 U.S. at 850. After former Judge Collins denied the motion to vacate the judgment based on disqualification under 28 U.S.C. § 455(a),[3] the Fifth Circuit reversed and remanded to a different judge for findings.

_____

[3]Section 455(a) provides that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."

Judge Charles Schwartz found that "although Judge Collins . . . lacked actual knowledge during trial and prior to the filing of his opinion, the evidence nonetheless gave rise to an appearance of impropriety." *Id.* at 851. Because Judge Schwartz read the Fifth Circuit's mandate as limited to the issue of actual knowledge, he denied the motion. *Id.* at 851. The Fifth Circuit then reversed and ordered the judgment vacated because an appearance of impropriety permeated the entire proceedings. *Id.* at 852.

The Supreme Court, quoting extensively from Judge Rubin's dissent on the merits, affirmed the vacatur and identified other unseemly facts. Former Judge Collins's alleged forgetfulness of Loyola's interest was characterized as "remarkable," his failure to attend the single most critical board meeting or open the minutes from that meeting when he received it two days before entering judgment was an "unfortunate coincidence," his failure to recuse himself when he admitted actual knowledge of the conflict was "remarkable – and quite inexcusable," and his stated reasons for denying the motion to vacate disregarded a "violation [that] is neither insubstantial nor excusable." *Id.* at 865-868.

In 1991, former Judge Collins was convicted of bribery, obstruction of justice, and conspiracy in connection with a criminal case pending before him. He was the first federal judge to be convicted of bribery, and he received a sentence of eighty-two

months imprisonment.  He resigned on the day before his impeachment hearing was scheduled to begin in 1993.

The *Liljeberg* litigation continued to be protracted and extremely contentious in the early 1990's when Judge Henry A. Mentz, Jr. ruled against the Liljeberg interests and ordered the seizure and sale of their property along with other damages. *Travelers Insurance Co. v. Liljeberg Enterprises, Inc.*, 7 F.3d 1203 (5th Cir. 1993).   The Fifth Circuit stated that the facts demonstrated that the Liljebergs had engaged in "as egregious and unconscionable [a] course of bad faith contractual dealings as the members of this panel can recall having encountered." *Travelers Insurance Co. v. St. Jude Hospital*, 21 F.3d 1107 at *1 (5th Cir. 1994).

The Liljebergs unsuccessfully sought Judge Mentz's post-judgment recusal based on  his social contacts, which included attorneys practicing at law firms representing the prevailing party.  Their attorney published a song that "is nothing more than a personal and extremely unprofessional attack on Judge Mentz." *Travelers Insurance Co. v. St. Jude Hospital of Kenner, La., Inc.*, 38 F.3d 1404, 1409, n. 6 (5th Cir. 1994).  In affirming the denial of the Liljebergs' disqualification motions and imposing sanctions against them, the Fifth Circuit specifically noted that "[m]any courts [] have held that a judge need not disqualify himself just because a friend – even a close friend – appears as a lawyer." *Id.*

5

at 1411, n. 13.  That statement was taken to heart after former Judge Porteous assumed

responsibility for the *Liljeberg* litigation.

According to the testimony of Mr. Mole, the *Liljeberg* interests and his client,

Lifemark Hospitals, Inc. ("Lifemark") had been in litigation since 1987.   Rec. Doc. 211 at

13.  According to the docket sheet in the lead case of the litigation before former Judge

Porteous, a motion to withdraw the bankruptcy reference was filed in June 1993 and

transferred among five judges until reassigned to former Judge Porteous in January

1996.  Mr. Mole enrolled as counsel in April 1996 with a non-jury trial setting in

November 1996.   At that time, however, the consistent lack of integrity on the part of

the Liljeberg interests and their counsel had been made part of the record, as the

sampling of Fifth Circuit criticisms set forth above indicates.

Approximately six weeks before trial, the Liljeberg interests enrolled Mr.

Levenson as co-counsel along with Jacob J. Amato, Jr. ("Amato"), an ex-law partner of

former Judge Porteous.[4]  There is no dispute that  Mr. Levenson and Amato were

personal friends with former Judge Porteous at the time of their enrollment and that

both were engaged on a contingency fee basis.   Mr. Mole did not know former Judge

---

[4]No further action was taken on the charges against Amato based on his disbarment in a separate disciplinary action also based on sworn testimony in hearings concerning the impeachment of former Judge Porteous and Amato's voluntary permanent resignation from the practice of law ordered by the Louisiana Supreme Court.   Rec. Doc. 14, *In re Amato*, Misc. 10-523 "I".

Porteous when he enrolled on behalf of Lifemark.

The docket sheet and exhibits from the disciplinary hearings also indicate that in October 1996, Lifemark filed a motion to recuse based on the appearance of impropriety under 28 U.S.C. § 455(a) created by the close relationship between former Judge Porteous and Mr. Levenson and Jacob Amato.  The motion was opposed by Liljeberg and denied later that month by former Judge Porteous, who also continued the November 1996 trial date to June 1997.  Lifemark promptly filed a writ of mandamus with the United States Fifth Circuit Court of Appeals, which denied the writ without assigning reasons in October 1996.  In March 1997, Lifemark enrolled Don C. Gardner ("Gardner") as additional counsel of record without objection and without prompting a motion to recuse.[5]  There is no dispute that Gardner was a close personal friend of former Judge Porteous at the time of the enrollment.

After a lengthy trial held intermittently between June 16, 1997, and July 23, 1997, former Judge Porteous took the matter under submission.  On April 26, 2000, he issued a 105-page opinion overwhelmingly in favor of the Liljeberg interests.  He overturned a judicial sale, reinstated contracts, and otherwise denied relief to Lifemark.  *Lifemark*

---

[5]Gardner was permitted to permanently resign from the practice of law before this Court by majority vote and order dated August 13, 2013.  Rec. Doc. 157.  Gardner admitted to improper fee-splitting with Tom Wilkinson ("Wilksinson") in conjunction with the *Liljeberg* litigation, but denied wrongdoing in all other respects.

*Hospitals of La., Inc. v. Liljeberg Enterprises*, Civ. Act. Nos. 93-1794+ (E.D. La.); Rec. Docs. 471–72. On appeal, the Fifth Circuit reversed and ruled overwhelmingly in favor of Lifemark, noting previous appellate criticisms of the Liljebergs from earlier opinions and adding quite a few more. "We conclude that the foundational principles of the entire set of the district court's rulings are deeply flawed. Such duties are not to be found in Louisiana law." *Liljeberg*, 304 F.3d at 424. "The extraordinary duty the district court imposed upon Lifemark, who loaned the money to build the hospital and held the mortgage on it to secure its payment, is inexplicable." *Id.* at 428. "This is mere chimera, existing nowhere in Lousiana. It was apparently constructed out of whole cloth." *Id.* at 429. The Fifth Circuit found that former Judge Porteous's findings "of a 'conspiracy' to wrest control of the hospital and medical office building from [the Liljeberg interests] border on the absurd." *Id.* at 431. "The district court and Liljeberg Enterprises offer no statutory or case law support for this proposition, for the simple reason that this is not the law." *Id.* "On the basis of its clearly erroneous 'conspiracy theory' findings, the district court erred as a matter of law in disregarding long-standing Louisiana jurisprudence that a judicial sale, once completed, cannot generally be undone." *Id.* at 434. The litigation was settled and dismissed immediately after remand from the Fifth Circuit.

On September 8, 2008, the Judicial Council of the Fifth Circuit issued an Order and Public Reprimand against former Judge Porteous for conduct that included violations of "several criminal statutes and ethical canons" while presiding over the *Liljeberg* litigation, including his denial of Lifemark's motion to recuse.  Exh. 34.  On March 17, 2010, House Resolution 1031 in the United States Senate exhibited Articles of Impeachment against former Judge Porteous, one of which involved his making "intentionally misleading statements at the recusal hearing [in the *Liljeberg* litigation] intended to minimize the extent of his personal relationship with the two attorneys." Exh. 32.  A hearing was held in the Senate in September 2010.  The Senate found former Judge Porteous guilty, impeached and removed him from office on December 8, 2010, and ordered him "forever disqualified to hold and enjoy any office or honor, trust or profit under the United States."   Exh. 37.

**Joseph N. Mole**

The Committee's charges against Mr. Mole focus on the hiring of Gardner as additional counsel for Lifemark after the failed motion to recuse and after the failed appeal of that ruling.  According to the amended charges, Mr. Mole violated the Disciplinary Rules of the Eastern District of Louisiana and Rule 8.4(d), (e) and (f) of the

9

Louisiana Rules for Professional Conduct,[6] which provide that it is professional

misconduct for a lawyer to:

> (d) Engage in conduct that is prejudicial to the administration of justice;
> (e) State or imply an ability to influence improperly a judge, judicial officer,
> governmental agency or official or to achieve results by means that violate the
> Rules of Professional Conduct or other law;
> (f) Knowingly assist a judge or judicial officer in conduct that is a violation of
> applicable Rules of Judicial Conduct or other law[.]

The Committee charges that Mr. Mole's selection and retention of Gardner was

prejudicial to the administration of justice, implied an ability to improperly influence a

judge and knowingly assisted a judge in conduct violating Canon 2, ¶ A of the Federal

Code of Judicial Conduct that requires a judge to "respect ... the law [and] conduct

himself at al times in a manner that promotes public confidence in the integrity and

impartiality of the judiciary." Rec. Doc. 152 at 7, ¶ 17.   In addition, Mr. Mole allegedly

violated all three cited provisions of the Louisiana Rules of Professional Conduct by

assisting former Judge Porteous's violation of Canon 2, ¶ B of the Federal Code of

Judicial Conduct, which requires that "[a] judge should not allow ... social, or other

relationships to influence his judicial conduct or judgment ... nor shall he convey or

permit others to convey the impression that they are in a special position to influence

---

[6]United States District Court for the Eastern District of Louisiana, Rules for Lawyer Disciplinary
Enforcement, Rules 1.2, 2.1.

him." Rec. Doc. 152 at 7, ¶ 18.

In post-hearing memorandum, the Committee recommends a sanction of one year suspension with six months deferred. Rec. Doc. 210 at 10. In response to Mr. Mole's motion for summary judgment, the Committee stated "the core issue is whether an attorney who knowingly searches for an attorney to retain who is a close friend of the presiding judge, submit[s] to his client the name of an attorney who has nothing of substance to offer other than such a friendship, and then negotiate[s] and draft[s] a contract that pays a $100,000 'severance' fee if the judge 'withdraws' violates the rules with which Respondent Mole is charged with having violated." Rec. Doc. 116 at 8.

Specifically, the amended charges state that Gardner's "only credential was he was one of Judge Porteous' closest friends." Rec. Doc. 152, p. 3 at ¶ 5. The Committee cites as support previous testimony from Mr. Mole that Gardner was enrolled because of his friendship with former Judge Porteous, that recusal was the only way to get a fair trial, that if a friend was not enrolled that Lifemark would have replaced Mr. Mole as counsel, that Mr. Mole told Gardner that Lifemark needed a friend of the former judge on his side, and that Gardner had no experience in complex federal cases. Rec. Doc. 152 at ¶¶ 6-7. The Committee also alleges misconduct on the part of Mr. Mole in the 1997 fee arrangement drafted by him between Lifemark and Gardner and, specifically, on its

provision for a $100,000 fee upon enrollment, certain other compensation depending on the outcome at trial and an additional $100,000 severance fee if former Judge Porteous withdrew or the case settled before trial.  Rec. Doc. 152 at ¶¶ 10-12; Exh. 14.  The Committee also charges that Gardner "did no real meaningful work" on the case other than "sitting at counsel's table during the trial and occasionally meeting with Judge Porteous."  Rec. Doc. 152 at p. 6, ¶ 14.

In addition to stipulations,[7] the undersigned construes the relevant evidence offered by the Committee at the hearing as focused on three different factual aspects of Mr. Mole's involvement with the hiring of Gardner.  Specifically, the Committee offered evidence intended to show that Mr. Mole intended to improperly influence former Judge Porteous and/or prompt recusal, because  (1) Mr. Mole hired Gardner "solely" because of his friendship with former Judge Porteous, (2) Mr. Mole drafted a fee agreement with Gardner that reflects this intent, and (3) Gardner did not contribute to the defense in a manner that justified the fee.[8]

**Gardner's friendship**

On this point, the Committee presented only a few pieces of evidence consisting

---

[7]A copy of the Stipulations is attached as "Exhibit B."  Rec. Doc. 203.

[8]Mr. Mole also proffered a transcript of expert testimony of Dane Ciolino presented at the Senate hearing.  This was excluded because the witness had not been properly identified prior to the hearing.

largely of a couple allegedly inconsistent statements from Mr. Mole. First, it argued

that his statement that Gardner was hired "solely" because he was a friend of former

Judge Porteous proves that he intended to raise the same appearance of impropriety it

had argued unsuccessfully in its motion to recuse. Rec. Doc. 211 at 50-51. Mr. Mole

used that adverb in his testimony before the Senate.

In the testimony at the evidentiary hearing, Mr. Mole patiently explained that he

has testified under oath at least five times about the conduct surrounding the

impeachment and its aftermath, including testimony before the Fifth Circuit Judicial

Conference, the House of Representatives Impeachment Task Force and the Senate

Impeachment Committee. He also testified that he has been interviewed numerous

other times by the FBI, the Justice Department, Special Counsel for the Fifth Circuit and

Special Counsel for both houses of Congress. Rec. Doc. 211 at 32.

In answer to numerous questions at the hearing, Mr. Mole convincingly and

repeatedly testified to the uncontested fact that Gardner was hired at the insistence of

his client primarily because he was a friend of former Judge Porteous—but only in an

effort to obtain a fair trial. According to Mr. Mole's credible testimony, the decision to

hire Gardner came only after Mr. Mole heard that the "fix" was on after the unsuccessful

recusal motion based on former Judge Porteous's close relationship with Amato and

Mr. Levenson.

The Fifth Circuit's denial of Mr. Mole's writ of mandamus on the recusal issue served as assurance to the defense team that there was nothing improper or appearing to be improper in hiring additional counsel who happened to be a close friend to former Judge Porteous. And the decision to hire additional counsel was that of in-house counsel for his client, Gary Ruff ("Ruff"), who insisted that someone who knew former Judge Porteous be added, something Mr. Mole testified he would have preferred not to do. Rec. Doc. 211 at 52–53. Mr. Mole testified that he was concerned that the client would have found a different way of handling the case, and that at the time he was concerned that he could be dismissed. Rec. Doc. 211 at 53.

Mr. Mole proceeded fairly quickly in hiring additional counsel. Rec. Doc. 211 at 57. One of Mr. Mole's partners recommended that he contact former Jefferson Parish Attorney Wilkinson who, in turn, met with and recommended Gardner.[9] Gardner was hired within one month of meeting Mr. Mole and the two only met once or twice before the hiring. Rec. Doc. 211 at 58. "I did rely on the fact that he told me, unprompted, that he would not do anything improper, that he did not feel that he could influence the judge and certainly would not try and I accepted that. That was important to me." Rec.

---

[9] Mr. Mole also made a point of vindicating Magistrate Judge Wilkinson of any involvement, contrary to any rumor or speculation. Rec. Doc. 211 at 46.

Doc. 211 at 58.

Mr. Mole candidly admitted that the primary requirement for additional counsel was a friendship with former Judge Porteous and an understanding of his judicial and courtroom demeanor. "He had to be alive, he had to be a lawyer and he had to have some knowledge of the courtroom; but the primary requirement was that he was somebody with whom Judge Porteous was comfortable and who knew Judge Porteous' habits and way of thinking." Rec. Doc. 211 at 50. It appears to the undersigned that Mr. Mole has never stated otherwise and that he has made that same statement, in various permutations, many times.

Mr. Mole agrees with the obvious proposition that had former Judge Porteous recused himself, there would have been no reason to hire Gardner. Rec. Doc. 211 at 75. He also convincingly and repeatedly testified that he would have preferred not to have needed to bring on additional counsel and that he harbored a "very naive hope" that former Judge Porteous would recuse himself with the additional enrollment of Gardner. "You know, I never stopped hoping that Judge Porteous would recuse himself, and I thought that if I were him and another one of my friends showed up, I would step aside because it looked bad, but I think that was naive. But the answer to your question, yes, I certainly considered that maybe if Don got involved, I knew Judge Porteous didn't

have a legal responsibility to recuse himself because of that but he might.  But he had

just refused.  In retrospect, it was very naive hope." Rec. Doc. 211 at 68.

The equally credible testimony of Kenneth A. Mayeaux ("Mayeaux") and Michael

Phillips ("Phillips"), co-counsel with Mr. Mole on the *Liljeberg* case, confirms this

testimony from Mr. Mole testimony in all respects.  Rec. Doc. 211 at 79–122.  The

deposition testimony of Ruff is equally consistent; he succinctly stated that they were

not seeking the recusal of former Judge Porteous in hiring Gardner, rather, "I mean, we

wanted to recuse him and that's why we filed the motion to recuse originally." Exh. 39

at 33.  All the witnesses who testified on this issue admitted that the decision to hire

Gardner was motivated by the desire to try to get a fair trial with an even playing field.

No one saw the hiring as improper in any respect.

Every critical aspect of Mr. Mole's testimony is also confirmed in the testimony of

Gardner at the hearing.   There is no dispute that Gardner was a close friend to former

Judge Porteous.  That friendship began in law school at LSU in the early 1970's.  Rec.

Doc. 211 at 123.  Former Judge Porteous was in his wedding party, is his daughter's

godfather, his family was part of former Judge Porteous's Thanksgiving dinner and all

three of former Judge Porteous's children called Gardner "Uncle Don." Rec. Doc. 211 at

145-46.  Gardner had attended CLEs with former Judge Porteous and, although he does

16

not like gambling, would give former Judge Porteous "'a couple of 20's'" at casinos on occasion.  Rec. Doc. 211 at 146.

Gardner testified that Wilkinson first contacted him about the possibility of enrolling in *Liljeberg* litigation in early 1997 and that he originally declined.  Rec. Doc. 211 at 148.  He also confirmed that he advised Mr. Mole that he would not do anything improper or illegal and was never asked to do anything to cause former Judge Porteous to recuse himself.  Rec. Doc. 211 at 132.  He knew Mr. Mole wanted what Gardner calls a "pretty face" at the defense table, which Gardner defined as "someone who knew the skinny on the judge in terms of his behavior, his demeanor, how he ruled, how he judged.   And I think I ultimately signed on for that reason, I thought I could help his team."  Rec. Doc. 211 at 151.

Gardner testified that he became convinced that he would be an asset to the defense team because he knew how former Judge Porteous handled things and that no one associated with the defense team ever asked him to do anything but ethically represent the client.  Rec. Doc. 211 at 129-30.  He testified that he felt he helped make the client feel better about the impartiality of former Judge Porteous, with whom he had "credibility."  Rec. Doc. 211 at 144.  Gardner stated that he was hired to assist in the presentation of the trial, not for his expertise in federal commercial litigation.  Rec. Doc.

17

211 at 154-55.

**Gardner's fee**

The structure of the fee agreement for Gardner's services received attention during the impeachment hearings and at the hearing before the undersigned.   The provisions for a $100,000 fee at enrollment and a separate $100,000 severance fee upon the withdrawal of former Judge Porteous or settlement drew the most controversy, because they were arguably indicative of an intent to improperly influence former Judge Porteous.  Exh. 16.  But Ruff testified in deposition that the $100,000 fee was neither excessive or unusual because so much money was at stake in the litigation.  Exh. 39 at 35-36.

According to Mr. Mole's testimony, the structure was mostly a "product of [his] thinking," with perhaps some input from the client.  Rec. Doc. 211 at 54, 62.  "I think the paragraph speaks for itself, to some extent, although I'll accept the criticism that it's a terribly drafted document."  Rec. Doc. 211 at 172.  Mr. Mole testified to a previous unpleasant experience with co-counsel in another case who refused to withdraw and claimed an unearned part of the ultimate outcome.  Rec. Doc. 211 at 173.  And he took to heart former Judge Porteous's statement that he would let counsel know if he changed his mind about recusal.  Rec. Doc. 211 at 173.

Mr. Mole credibly testified that he had not realized until the Senate hearing that the various drafts of the fee agreement were sent to Gardner in care of Wilkinson and that he just did not remember talking to Wilkinson about the letters and, when pressed, could only speculate reasons, including that Gardner was hard to get a hold of, did not use email, had one fax for friends and another for opposing counsel, and that Wilkinson may have simply asked that Mr. Mole go through him.[10] Exhs. 14-16; Rec. Doc. 211 at 63–65.   He assumed he talked to Gardner about the fee arrangement, but more clearly recalled that his primary concern was the amount of the enrollment fee, which was raised from $50,000 to $100,000 in order to get Gardner involved, based on the fact that "it was unlikely that Mr. Gardner was going to earn beyond $100,000" in his solo practice for the time he would be spending on the *Liljeberg* litigation.   Rec. Doc. 211 at 65.   That additional $50,000 was shifted from a category for a severance fee contingent upon either the withdrawal of former Judge Porteous or settlement, neither of which anybody thought likely.   Rec. Doc. 211 at 62-64, 70.   The enrollment fee was paid by the client.   Rec. Doc. 211 at 66.   Mr. Mole did not recall otherwise talking "nuts and bolts" with Gardner about the agreement. Rec. Doc. 211 at 69.

Mr. Mole also credibly testified that he had never drafted an agreement that

---

[10]There is no evidence to support the suggestion that Mr. Mole was aware of the fee-splitting agreement between Gardner and Wilkinson.

contained a severance fee contingency, along with fees based on the outcome of the litigation. Exh. 16; Rec. Doc. 211 at 73. He candidly stated that its purpose reflected the reality that if former Judge Porteous were to quit the case, there was no need for Gardner's services. Rec. Doc. 211 at 60. "[L]ike I said, I think if we had another judge, we would have won and all of [the] other contingencies would have been very likely to have occurred, and I don't think [Gardner] would have been entitled to them." Rec. Doc. 211 at 70. "So his involvement would be no longer necessary, and I didn't want him to get any more money after that. But due to the amount of time he had to block out of his relatively daily practice and flow of cases, [this] was $100,000 and the possibility of $100,000 more." Rec. Doc. 211 at 70. "It's not the best, strongest letter in the world, but it's what I did at the time under harsh circumstances." Rec. Doc. 211 at 70.

Mr. Mole also recognized the reality that numerous judges had transferred the case and that a newly appointed judge could prompt another reallotment as well. Rec. Doc. 211 at 67-68. "And I would have been delighted if Judge Porteous had recused himself." Rec. Doc. 211 at 71-72. "And, no, my client wasn't willing to pay anybody to recuse the judge. Nobody pays Don Gardner money to get the judge recused. That was a side effect that I thought of. I don't think I expressed it to anybody." Rec. Doc. 211 at

75. The undersigned finds credible the hearing testimony that Mr. Mole never shared his hopes that former Judge Porteous would recuse himself with the enrollment of Gardner with anyone, although it is contrary to his Senate testimony that he had talked about his hopes for recusal to Gardner; Mr. Mole explained at the hearing that the Senate testimony was speculative on his part.  Rec. Doc. 211 at 194.

Gardner's testimony at the hearing again confirms Mr. Mole in all relevant respects.  With regard to recusal, he testified that Mr. Mole only advised him that they had filed and lost a motion to recuse, and was concerned that former Judge Porteous was aggravated as a result.  Rec. Doc. 211 at 131.  With regard to the $100,000 enrollment fee, Gardner testified that his involvement in the case would cause him to lose business.  Gardner testified that there was no negotiation over the fee and that the fee agreement was "unilaterally written," but the undersigned finds no conflict with Mr. Mole's explanation that he knew he needed to raise the enrollment fee to get Gardner involved because Gardner would be absent from his own practice.  Rec. Doc. 211 at 151. Gardner testified repeatedly that he insisted on participating and that the fee structure letter did not "then or now" give him incentive to do other than participate.  Rec. Doc. 211 at 157-59.  Moreover, Gardner testified that the enrollment fee was not extravagant when the number of hours he worked on the case were considered.  Rec. Doc. 211 at

168-69.

Gardner spent much of his testimony at the hearing explaining portions of his testimony before the Senate when he was recovering from a fall from a ladder and taking pain pills. Rec. Doc. 211 at 163. Gardner insisted that his controversial comment that the defense wanted a "pretty face" were his words, not Mr. Mole's, and he meant someone who knows that judge. Rec. Doc. 211 at 152–54. Gardner explained that his testimony before the Senate that he then was of the opinion that the severance provision was an incentive to get former Judge Porteous off the case was "after-the-fact" and he repeatedly emphasized that no one ever asked him to act improperly. Rec. Doc. 211 at 161. He also testified before the Senate that the severance fee was "a big incentive," but that he did not think it provided enticement for someone with scruples, and neither he nor Mr. Mole did anything unethical. Rec. Doc. 211 at 162-63. "And although I could have received additional compensation for doing things, I wanted everyone to know that I didn't and nobody asked me to." Rec. Doc. 211 at 163.

**Gardner's performance**

According to the Amended Charging Document, Gardner did "no meaningful work" other than sitting at counsel's table during the trial and occasionally meeting with Judge Porteous." Rec. Doc. 152 at ¶ 14. The Committee's charge relies in part on Mr.

22

Mole's previous testimony during impeachment proceedings that Gardner "was never in the way is the best thing I can say, and the mildest thing I can say." Rec. Doc. 152 at ¶ 14.   The undersigned finds that statement reflects neither Gardner's actual performance nor Mr. Mole's actual assessment of it.  Instead, Gardner testified that although Gardner did not question any witnesses or argue at trial, he was invited to private conferences held by former Judge Porteous in his chambers "pretty much every evening" during trial along with Amato and Levenson, which provided much comfort to his client—and was what the client wanted in hiring Gardner.  Rec. Doc. 211 at 73. "And, you know, he worked with me and he sat by my side every minute of the trial and suggested questions, told me when to stop, told me how he thought it was going and whether I should call the next witness along certain lines or not, so I did rely on him quite a bit." Rec. Doc. 211 at 73.  Mr. Mole further testified that Gardner helped him prepare for the next day every night.  Rec. Doc. 211 at 73.

With regard to the single derogatory comment contained in the Committee's charges about Gardner, Mr. Mole convincingly explained that he felt "immediately bad" and asked that the statement be put in the context of the remainder of his House testimony that reflected all Gardner contributed to the defense and did for his client. Rec. Doc. 211 at 73-74.  Mr. Mole offered that he thinks he got a "bit frustrated" at the

23

House of Representatives hearing with all of the questions from multiple congressmen about Gardner. Rec. Doc. 211 at 74. "I thought the only way we were going to get a fair shake out of the trial system was to have [former Judge Porteous] not be the judge. And again, if he had done the right thing at any point along the way, none of us would be here today and I wouldn't have been through this. I wouldn't have been cross-examined or examined by august bodies five times." Rec. Doc. 211 at 74-75. "Obviously it was fixed." Rec. Doc. 211 at 34.

Again, the equally credible testimony of Mayeaux and Phillips, co-counsel with Mr. Mole on the *Liljeberg* case, confirm his testimony in all respects, as does the deposition testimony of Ruff. Exh. 39; Rec. Doc. 211 at 79-121. All attest to the value Gardner added to the defense team at trial. Ruff appreciated that a defense attorney was immediately included in the conferences held by former Judge Porteous in chambers and the insight that Gardner brought, and he only wanted a fair trial as a result of hiring Gardner. Exh. 39 at 36, 61–62, 66-67.

Phillips testified to an specific example of the type of value Gardner brought to the defense. The defense was faced with "a very unusual situation" at trial where Judge Porteous extensively cross-examined certain witnesses to a degree that the defense felt compelled to object for the record. Rec. Doc. 211 at 104. Off the record, former Judge

Porteous had "an extreme reaction" and was "clearly very upset" with the defense. Rec. Doc. 211 at 104. The defense relied on Gardner's insight into how to approach the bench on the next trial day. Rec. Doc. 211 at 105.

While admitting that federal litigation is not his specialty, Gardner did testify at the hearing that he has been involved in federal court litigation in over twenty cases and had tried many cases during his 41 years as an attorney. Rec. Doc. 211 at 125. He began his preparation for the June 16, 1997, *Liljeberg* trial in March 1997. He testified that Mr. Mole "saturated" him with everything in the case and he read it all. Rec. Doc. 211 at 136. He met with Mr. Mole to learn the case, along with the rest of the team prior to trial and was involved with pre-trial preparation of documents and witnesses. Rec. Doc. 211 at 136. During the trial, he would meet with the defense team and prepare for the next day. Rec. Doc. 211 at 138. Gardner also testified that he attended every conference with former Judge Porteous during the trial and was involved in trying to mediate the case mid-trial. Rec. Doc. 211 at 135–37. He estimated that had he billed by the hour, his fee would have approximated $80,000 or more. Rec. Doc. 211 at 167-68.

Gardner also testified that he had tried and lost cases in state court before former Judge Porteous. Rec. Doc. 211 at 126. He testified that he had no *ex parte* contact with

25

former Judge Porteous during the trial, but admitted to social contact with him after

submission but before the opinion was issued, including lunches and a bachelor party

for former Judge Porteous's son in Las Vegas in 1999 or 2000.[11]  Rec. Doc. 211 at 141, 147.

He testified that at no time did he discuss the litigation with former Judge Porteous *ex*

*parte*.  In voluntarily resigning from the practice of law for fee-splitting with Wilkinson,

Gardner maintains that at no time did he try to  improperly influence former Judge

Porteous while the matter was under submission.

   In making its findings and recommendation regarding Mr. Mole, the

undersigned explicitly finds that there was no evidence to suggest that Gardner ever

had a one-on-one *ex parte* communication about anything relevant to the litigation with

former Judge Porteous between the time the case was submitted and decided.[12]

## FINDINGS RE: JOSEPH N. MOLE

   Three specific instances of misconduct are charged against Mr. Mole.  The first

falls under the proscription contained in Rule 8.4(d) against conduct "prejudicial to the

administration of justice."  The second, under Rule 8.4(e), alleges he "stat[ed] or

---

[11]It should be noted that Mr. Levenson states in his memorandum that his co-counsel Amato also attended the Las Vegas bachelor party.  Rec. Doc. 8 at 7.

[12]Although not raised at the hearing before the undersigned, Gardner acknowledged at the Senate hearing that he testified to the grand jury that he "may" have made an *ex parte* comment in chambers during the trial, but that he had immediately corrected himself that Mr. Levenson was present. Exh. 3 at 162–64.

impl[ied] an ability to influence improperly a judge . . . to achieve results by means that violate the Rules of Professional Conduct or other law." The final charge arises under Rule 8.4(f) and its proscription against "knowingly assist[ing] a judge or judicial officer in conduct that is a violation of applicable Rules of Judicial Conduct or other law." The undersigned unhesitantly finds no misconduct on the part of Mr. Mole as to any of these rules.

It is difficult to articulate how any of the challenged conduct on the part of Mr. Mole could be construed as either prejudicial to the administration of justice or assisting a judge to violate any rule for purposes of Rule 8.4(d) and (f). Rule. 8.4(e) focuses on an attorney's effort to <u>improperly</u> influence a judge. All trial attorneys are paid to influence the judge in an arena where influence is everything; it is only <u>improper</u> influence that eradicates even the possibility of justice. There has been absolutely no showing that Mr. Mole acted improperly with regard to the addition of Gardner to the defense team. And there can be no claim of any other questionable influence, proper or improper, on this presiding judge by Mr. Mole, whose acknowledgment that the former Judge Porteous was not "fond" of him finds solid support throughout the *Liljeberg* record.

In so finding, the undersigned rejects a number of subsidiary arguments made by

the Committee.  First, the decision to add Gardner as additional counsel was not

"solely" based on friendship, even if "friend" is a good word to describe an attorney who

has personal insight into the presiding judge's preferences and way of thinking because

he is well-liked by the judge.  To the extent it is relevant, the facts indisputably show

that the decision to hire additional counsel who was familiar with former Judge

Porteous was made by the client, not Mr. Mole, who would have preferred not to.[13]

Next, there is nothing in the fee agreement remotely designed to encourage Gardner to

improperly influence former Judge Porteous to recuse, and there has been insufficient

proof that any party to that agreement had such an intent when confecting it.  In fact,

the undersigned finds that the fee arrangement with Gardner was eminently practical

under the circumstances and, in any event, Gardner fully earned his fee and added a

fleeting glimmer of hope to the defense's ordeal before its jaw-droppingly stunning

defeat at trial.

In addition, the fact that Mr. Mole argued the existence of the appearance of

impropriety under 28 U.S.C. § 455(a) in the defense motion to recuse does not support

the Committee's position. Not only did the Fifth Circuit deny the defense writ, but it did

---

[13]Even if this was relevant to the distinct issue of misconduct, the undersigned notes that "agreeing to the client's demand for certain improper behavior or result" is designated as a factor that is neither aggravating nor mitigating under the ABA *Standards for Imposing Lawyer Sanctions* ("*ABA Standards*").

so having previously criticized the Liljebergs' conduct in opinions involving the earlier

manifestations of the extended litigation.   Exh. 12; Rec. Doc. 211 at 36, 38.   Under the

shamefully unique facts attendant to the entire history of the *Liljeberg* litigation, it defies

reason and logic to expect Mr. Mole to read the Fifth Circuit's writ denial as other than

supportive of Judge Porteous's decision not to recuse and a recognition of his promise

to all parties that he would revisit the issue if necessary.   The undersigned finds that

Mr. Mole did take the "high road" in making his record, fully informed the Fifth Circuit

of his dilemma and that the Fifth Circuit's denial of the writ provided a more than

ample level of ethical comfort for Mr. Mole to proceed as his client instructed and as he

did.   In addition, the undersigned finds that the denial by the Fifth Circuit serves to

reduce the basis of any allegation of misconduct against Mr. Mole to, at most,

"negligent" and time-barred under Louisiana Supreme Court, Rule XIX (Lawyer

Disciplinary Enforcement).

Next, if there is a set of circumstances and case history that would warrant the

announcement of a new and crystal-clear rule that a friend of a presiding judge can

never appear before him or her because it always raises the appearance of impropriety,

these are not those circumstances.   There is now some clearer Louisiana authority for a

mandatory procedure to have certain motions to recuse heard by another judicial

officer.   *Disaster Restoration Dry Cleaning, L.L.C. v. Pellerin Laundry Machinery Sales Co.,*

*Inc.*, 927 So.2d 1094 (La. 2006).[14]  In this instance, however, any fault on the part of former Judge Porteous should not be visited upon Mr. Mole.

Finally, in the strongest opinion of the undersigned, this district should recognize that the minefield Mr. Mole successfully navigated was caused by a failure of the judiciary.  Despite Mr. Mole's unfailingly cheerful candor during testimony, the frustration and stress that accompanied seventeen miserable years spent protecting his client against a corrupt judge was palpable.  His "very naive hope" that the system might work may have helped him in persevering, and he should not be punished for having that survival skill in his repertoire.  Had Mr. Mole been a lesser advocate than he is, he could have abandoned his client to its fate or joined in the corruption he sensed.  Instead, Joseph N. Mole diligently represented his client at all times in a manner that is a credit to the profession.

Although these charges against Mr. Mole did add insult to injury, the undersigned recognizes that inquiry into the enrollment of Gardner needed to be made. Throughout these disciplinary proceedings, the undersigned has recognized that the Committee was following up on a complaint filed by two sitting judges and involving

---

[14]Ironically, that case involved the recusal of Judge Hans Liljeberg in the 24th Judicial District Court based on Mr. Levenson's dispute regarding his fee from the *Liljeberg* litigation.

arguably the biggest scandal to face this district.[15] The undersigned's opinion with

regard to Mr. Mole is not intended to detract from the recognition of the hard work

done by the Committee, or the appreciation it deserves for its service.



[15]Were it not for these two circumstances, the undersigned would have been inclined to grant summary judgment in favor of Mr. Mole.



Accordingly,

IT IS RECOMMENDED that the charges against Joseph N. Mole be DISMISSED

and that a formal apology be offered.

New Orleans, Louisiana, this 24th day of July, 2014.

HELEN G. BERRIGAN
UNITED STATES DISTRICT JUDGE

45